**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BARBARA JOAQUIN,                                :
                                                :
          Plaintiff,                            :          Civil Action No.:      14-01119 (RC)
                                                :
          v.                                    :          Re Document Nos.:      10, 13, 14
                                                :
FRIENDSHIP PUBLIC CHARTER SCHOOL,  :
                                                :
          Defendant.                            :

<u>**MEMORANDUM OPINION**</u>

GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY
JUDGMENT

## I. INTRODUCTION

Barbara Joaquin brought this action against the Friendship Public Charter School under

the Individuals with Disabilities Education Act.  Ms. Joaquin appeals from an administrative

decision rejecting her claim that the defendant violated the Act by failing to provide her son G.H.

with a free appropriate public education.  Before the Court are the parties' cross-motions for

summary judgment.  For the reasons given below, the Court grants in part and denies in part both

motions and remands the case to the hearing officer for further proceedings.

## II. BACKGROUND

### A. Statutory Framework

Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a free appropriate public education that emphasizes special education and related services

designed to meet their unique needs and prepare them for further education, employment, and

independent living." *Henry v. District of Columbia*, 750 F. Supp. 2d 94, 96 (D.D.C. 2010) (quoting 20 U.S.C. § 1400(d)(1)(A)).  "A free appropriate public education entitles 'each child with a disability' to an 'individualized education program' that is tailored to meet his or her unique needs." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)-(2)(A)).

The individualized education program ("IEP") is the "primary vehicle" for implementing the IDEA.  *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C. Cir. 2006) (citation omitted).  The IEP is "[p]repared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child."  *Id.* (citation omitted).  It "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *Id.* (citation omitted).

When the parents of a student with a disability are dissatisfied with a school district or agency's "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," 20 U.S.C. § 1415(b)(6), the IDEA entitles them to present their arguments in an "impartial due process hearing," *see id.* § 1415(f).  Any party aggrieved by the hearing officer determination may bring a civil action in state or federal court. *Id.* § 1415(i)(2)(A).

### B.  Factual Background

In late February 2013, Ms. Joaquin's son G.H. was first identified as a student who suffers from attention deficit hyperactivity disorder and other disabilities.  *See* AR 413, 423, 429–50.  At the time, he was a student in the District of Columbia's Friendship Collegiate

Academy ("Collegiate"), which was part of the Friendship Public Charter School ("FPCS").  *See* AR 205.

Following the identification of these disabilities, G.H.'s IEP Team convened and developed an IEP to structure his schooling for the next twelve-month period, through late February 2014.  *See* IEP, AR 429–50.  The IEP called for 24.5 hours of "specialized instruction" and 60 minutes of "behavioral support services" per week.  *See id.* at 439.  The IEP also provided for "transition services" in the form of service field trips and 45 minutes per day of college and career preparation.  *See* IEP, AR 445–46.  Soon thereafter, in early March 2013, a team developed a Behavior Intervention Plan ("BIP") recommending, among other strategies, that G.H.'s teachers and support staff (1) "check in with [G.H.] frequently," (2) provide "constant, positive reinforcement for appropriate behavior," (3) "provide immediate verbal praise and/or public recognition for appropriate behavior and task completion," (4) offer "verbal praise . . . for any achievements," (5) assign him certain classroom "responsibilities [that] he prefers (i.e. handing out papers or being the group leader)," and (6) give him a "daily tracker" for use in monitoring his own performance and behavior.  BIP, AR 217–18.

In April 2013, over Ms. Joaquin's objection, FPCS moved G.H. to Options Public Charter School ("Options"), citing G.H.'s lack of success at Collegiate.  *See* AR 221–22.[1]  The "co-located" instruction program at Options was designed for students with behavior management challenges and featured classrooms staffed with a special education teacher, a clinician, and a behavior technician.  *See id.*; Tr. 440–45.  At Options, during the remainder of

_____

[1] Although FPCS contracted with Options to have the latter provide certain services to G.H., the hearing officer found that FPCS remained G.H.'s local education agency ("LEA") under the IDEA responsible for providing a free appropriate public education, and neither party challenges this conclusion.  *See* Order on FPCS' Mot. to Implead Options Public Charter School, AR 148–50; Mem. Supp. Pl.'s Mot. Summ. J. 4 n.2.

the 2012–13 school year, G.H. had a poor attendance record, failed half of his classes, and received D's in the other two classes. *See* AR 598. In the summer of 2013, G.H. performed relatively well at Options on account of one-on-one instruction. *See* Tr. 136–37; AR 655. During the first quarter of the 2013–14 school year, however, G.H. again failed half of his classes and struggled with absences. *See* AR 604–10.

While at Options, G.H.'s weekly schedule consisted of 11 hours of instruction in English, Math, Science, and History. *See* AR 618. G.H. spent another approximately 7.1 hours in physical education, computer-based activities, and sessions called "Read Aloud." *Id.* The remainder of his days included time for community meetings, anger management, and sessions called "Fun Friday" and "Real Talk." *Id.* G.H.'s weekly schedule did not indicate that he received any of his IEP-mandated transition services. *See id.*; Tr. 128–29.[2] Before the hearing officer, G.H. testified that he spent nearly all of his time at Options sitting at a computer, *see* Tr. 112–13, that he never discussed college or career preparation, *see id.* at 128–29, that he was never given classroom responsibilities, and that, while he was aware of his behavior tracker, he was not given the tracker or tasked with monitoring his performance, *see id.* at 132–34. The clinical supervisor and special education coordinator at Options, by contrast, testified that G.H. received all of the services mandated by his IEP. *See id.* at 471, 511–12.

At Ms. Joaquin's request, in October 2013, FPCS asked the District of Columbia Office of the State Superintendent of Education to place G.H. at New Beginnings Vocational Program ("New Beginnings"), on the basis of G.H.'s aggressive behavior and lack of progress. *See* AR 558–64, 577–85. Days later, faced with G.H.'s persistent absences despite repeated

---

[2] The weekly schedule does not appear to correspond specifically to the 2012–13 or 2013–14 school year. *See* AR 618. Because the parties assume that the schedule governed all of G.H.'s time at Options, the Court will do so here as well.

communications with Ms. Joaquin, FPCS referred G.H. to the District of Columbia Superior Court for truancy.  *See* AR 609–17.  G.H. eventually was placed at New Beginnings, where at least initially, he was passing all of his classes.  *See* AR 303.

In January 2014, Ms. Joaquin filed a due process complaint notice alleging that FPCS had denied G.H. a free appropriate public education, in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*  *See* Due Process Compl. Notice, AR 3–14. Specifically, the due process complaint alleged that FPCS failed to implement G.H.'s IEP or, in the alternative, to provide or develop an appropriate IEP.  *See id.* ¶¶ 76–108.  Following a two-day due process hearing, the hearing officer rejected Ms. Joaquin's claims and denied all requests for relief.  *See* Hearing Officer Determination ("HOD"), AR 730–44.

In June 2014, Ms. Joaquin filed a complaint in this Court.  Her complaint alleges that from June 6, 2013, through October 26, 2013, FPCS failed to implement G.H.'s IEP and to provide an appropriate school placement, and that from June 6, 2013, through February 27, 2014, FPCS failed to provide G.H. with an appropriate IEP.  *See* Compl. ¶¶ 10–13.  By way of relief, Ms. Joaquin asks the Court to declare that FPCS denied G.H. a free appropriate public education in violation of the IDEA; order FPCS to provide G.H. with comprehensive psychological, functional behavioral, and level III vocational and other assessments; order FPCS to convene an IEP team meeting to review and revise G.H.'s IEP; and mandate compensatory education.  *See id.* at 3.

Ms. Joaquin then moved for summary judgment.  *See* ECF No. 10.  FPCS subsequently cross-moved for summary judgment.  *See* ECF Nos. 13, 14.[3]  Both motions are now fully briefed.

### III.  STANDARD OF REVIEW

Following an administrative proceeding under the IDEA, any party that is "aggrieved by the findings and decision" of the hearing officer may bring a civil action in federal court.  20 U.S.C. § 1415(i)(2).  The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  *Id.* § 1415(i)(2)(C); *see also* 34 C.F.R. § 300.516(c).  Given the court's authority to hear additional evidence, the "IDEA plainly suggests less deference than is conventional in administrative proceedings."  *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989)) (alteration and internal quotation marks omitted).  But the court's review based on the preponderance of the evidence is not to be confused with "unfettered de novo review."  *Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006).  Rather, the court must accord "due weight" to state administrative proceedings.  *Id.* (quoting *Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)).  And "a court upsetting the [hearing] officer's decision must at least explain its basis for doing so."  *Reid*, 401 F.3d at 521 (citation omitted).  Moreover,

---

[3] Docket number 13 contains FPCS's cross-motion and supporting memorandum; docket number 14 contains FPCS's statement of facts; and docket number 15 combines the documents filed at docket numbers 13 and 14.  The docket indicates that both documents 13 and 14 (but not document 15) are pending motions.  For simplicity, the Court will consider documents 13, 14, and 15 collectively as constituting FPCS's cross-motion and attachments.  *See* ECF Nos. 13–15.

the party bringing the challenge "take[s] on the burden of persuading the court that the hearing

officer was wrong." *Id.* (citation omitted).

In a civil action challenging a hearing officer determination under the IDEA, "[a] motion

for summary judgment operates as a motion for judgment based on the evidence comprising the

record and any additional evidence the Court may receive." *D.R. ex rel. Robinson v. District of

Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009).  Where neither party submits additional

evidence for the court's review, "the motion for summary judgment is simply the procedural

vehicle for asking the judge to decide the case on the basis of the administrative record."

*Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997); *accord Savoy v. District of

Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012).


## IV.  ANALYSIS

Ms. Joaquin seeks summary judgment on her claims that FPCS failed to implement

several elements of G.H.'s IEP and that, largely due to these failures, G.H.'s placement at

Options was inappropriate as a whole.  In its cross-motion, FPCS contends that it complied with

the IDEA and all material terms of G.H.'s IEP, and that any shortcomings in G.H.'s education

resulted from his truancy.

A duly formulated IEP "need not guarantee the best possible education or even a

'potential-maximizing' one." *Leggett v. District of Columbia*, 793 F.3d 59, 70 (D.C. Cir. 2015)

(citation omitted).  "Instead, an IEP is generally 'proper under the Act' if 'reasonably calculated

to enable the child to receive educational benefits.'" *Id.* (quoting *Rowley*, 458 U.S. at 207).

"Once the IEP is developed, the school system must provide an appropriate placement that meets

those needs" or else enable the student to seek adequate private services. *Petties v. District of

Columbia*, 238 F. Supp. 2d 114, 116 (D.D.C. 2002) (concluding that defendant school district's

failure to pay private providers constituted a unilateral change in placement in violation of the

IDEA).  At a minimum, the placement must be "based on the child's IEP," 34 C.F.R.

§ 300.116(b)(2), and be "capable of fulfilling the student's IEP," *Lofton v. District of Columbia*,

7 F. Supp. 3d 117, 123 (D.D.C. 2013); *see also Roark*, 460 F. Supp. 2d at 44 (explaining that

appropriateness hinges on whether school "*can* provide" services mandated by IEP (emphasis

added)).

Because a mere "*de minimis* failure to implement all elements of [an] IEP" does not

amount to a violation of the IDEA, a party challenging an IEP's implementation must

"demonstrate that the school board or other authorities failed to implement substantial or

significant provisions of the IEP." *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 274

(D.D.C. 2011) (quoting *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir.

2000)).  This showing does not require an "abstract inquiry into the significance of various

'provisions' . . . of the IEP," but rather a "contextual, *ex post* analysis—i.e., whether the [violated

IEP] requirements are feasible and in the best interest of the child as she progresses." *Catalan ex*

*rel. E.C. v. District of Columbia*, 478 F. Supp. 2d 73, 76 (D.D.C. 2007).  Framed differently,

"deviations from the IEP's stated requirements [must be] 'material'" to give rise to liability

under the IDEA. *Id.* at 75 (quoting *Bobby R.*, 200 F.3d at 349).  Courts undertaking a materiality

analysis have "focused on the proportion of services mandated to those actually provided, and

the goal and import (as articulated in the IEP) of the specific service that was withheld." *Turner*

*v. District of Columbia*, 952 F. Supp. 2d 31, 40 (D.D.C. 2013) (citation and emphasis omitted).

A "minimal difference in hours [of services] provided by [a defendant] and required by [the

student's] IEP" will not constitute the denial of a free appropriate public education. *Savoy*, 844

F. Supp. 2d at 34.  At the other extreme, a plaintiff need not prove that the student suffered

"demonstrable educational harm" in order to prevail on a claim that an IEP was not

implemented.  *Wilson*, 770 F. Supp. 2d at 275 (citation and emphasis omitted).[4]

Courts have "broad discretion" to fashion remedies for IDEA violations.  *Florence Cnty.*

*Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 16 (1993) (citation omitted); *accord*

*Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015).  Such remedies may

include compensatory education in the form of programs that "make up for prior deficiencies."

*Reid*, 401 F.3d at 522.  An award of compensatory education must follow a "fact-specific"

inquiry and be "reasonably calculated to provide the educational benefits that likely would have

accrued from special education services the school district should have supplied in the first

place."  *Id.* at 524.

### A.  Denial of a Free Appropriate Public Education

In her motion for summary judgment, Ms. Joaquin argues that the hearing officer erred in

concluding that G.H. was not denied a free appropriate public education.  She submits four bases

for finding such a denial: In her view, FPCS provided insufficient specialized instruction, offered

---

[4] Most district judges in this Circuit have cited with approval the Fifth Circuit's emphasis on "substantial or significant provisions" in *Bobby R.* while also developing a more holistic "materiality" test inquiring into the objectives and proportion of services not rendered.  *See, e.g.*, *Savoy*, 844 F. Supp. 2d at 31 (describing "consensus among federal courts" as to *Bobby R.*, while citing proportionality test of *Wilson*, 770 F. Supp. 2d at 275).  This Court, however, notes a tension between the former and latter approaches, as the *Catalan* court recognized as well.  The *Bobby R.* court focused on whether "the significant provisions of [the student's] IEP were followed" and cited with approval *Gillette v. Fairland Board of Education*, 725 F. Supp. 343 (S.D. Ohio 1989), in which the court found no IDEA violation even where "portions of the IEP were not implemented at all."  *Bobby R.*, 200 F.3d at 349–50.  Under the "materiality" approach, however, the total failure to implement an IEP-mandated service would more likely—though not necessarily—give rise to IDEA liability, since the court does not undertake a threshold "abstract inquiry" into whether the unimplemented IEP provision was "significan[t]," as *Bobby R.* could be read to require.  *Catalan*, 478 F. Supp. 2d at 76.  In any event, even if this Court were to apply *Bobby R.* literally and ask this threshold question, the outcome would be the same: The Court would conclude that G.H.'s transition services were "substantial or significant" and that the two unimplemented BIP strategies were not.  *See infra* Part IV.A.2, A.3.

no transition services, failed to fully implement G.H.'s BIP, and improperly placed G.H. in the

co-located classroom at Options.[5]  Below, the Court concludes that because FPCS's failure to

provide any transition services was a material deviation from G.H.'s IEP, Ms. Joaquin is entitled

to judgment that FPCS violated the IDEA in that respect.  As to Ms. Joaquin's other claims,

because she has failed to carry her "burden of persuading the court that the hearing officer was

wrong," *Reid*, 401 F.3d at 521, the Court denies her motion for summary judgment and grants

FPCS's cross-motion for summary judgment.

### 1. Specialized Instruction

Ms. Joaquin first contends that FPCS provided G.H. with only approximately 18.1 hours

per week of specialized instruction at Options, in violation of the IEP's undisputed 24.5-hour

requirement.  Mem. Supp. Pl.'s Mot. Summ. J. 8–9.[6]  For the reasons given below, the Court

denies Ms. Joaquin's motion for summary judgment on this issue and grants FPCS's cross-

motion.

At the outset, as FPCS contends, Ms. Joaquin waived her argument that G.H. received

only 18.1 hours of specialized instruction per week at Options by failing to assert it before the

hearing officer.  *See Roark*, 460 F. Supp. 2d at 43 ("[T]his Court cannot address an issue that was

not first presented to the hearing officer."); 20 U.S.C. § 1415(i)(2)(A) ("[A]ny party aggrieved

---

[5] Like her due process complaint, Ms. Joaquin's complaint in this case contends not only that FPCS failed to implement G.H.'s IEP, but also, in the alternative, that FPCS "fail[ed] to *develop* an appropriate IEP for G.H."  Compl. ¶ 14 (emphasis added).  But Ms. Joaquin's motion for summary judgment contains no discussion of this alternative claim.  *See generally* Mem. Supp. Pl.'s Mot. Summ. J.  And by failing to press this claim in her opposition to FPCS's cross-motion for summary judgment requesting affirmance of the hearing officer determination, Ms. Joaquin has conceded the issue.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003).

[6] The parties do not dispute that G.H.'s IEP called for 24.5 hours of specialized instruction per week.  *See* IEP, AR 439; *see also* Mem. Supp. Def.'s Opp'n & Cross Mot. Summ. J. 8.

by the findings and decision made under this subsection, shall have the right to bring a civil

action *with respect to the complaint presented* pursuant to this section . . . ." (emphasis added));

Mem. Supp. Def.'s Opp'n & Cross-Mot. Summ. J. 7.  In her opposition and reply, Ms. Joaquin

contends that she raised the issue before the hearing officer, citing portions of the hearing

transcript, but the Court finds nothing in the record to support this contention.  *See* Pl.'s Opp'n &

Reply 6 (citing Tr. 106–19, 625–28).  In fact, Ms. Joaquin's argument before the hearing officer,

which she does not press here, seems to have been that *none* of the instruction that G.H. received

at Options qualified as specialized instruction, given that it was administered on a computer.  *See*

Tr. 625–28; *see also Herbin ex rel. Herbin v. District of Columbia*, 362 F. Supp. 2d 254, 263

n.10 (D.D.C. 2005) (finding failure to exhaust claim of IDEA procedural violation alleging

"absence of notice" concerning reevaluation, where "[t]he issue raised at the hearing was

whether the school's reevaluation efforts were timely" (emphasis omitted)).[7]

    Even if Ms. Joaquin did not waive her argument that G.H. received only 18.1 hours of

specialized instruction per week at Options, Ms. Joaquin has not carried her "burden of

persuading the court that the hearing officer was wrong" to conclude that G.H. received

sufficient specialized instruction.  *Reid*, 401 F.3d at 521; HOD, AR 739–40.  Pointing to G.H.'s

---

[7] In explaining why she should be excused from the exhaustion requirement, Ms. Joaquin has attached to her opposition and reply a verified statement from her counsel in the administrative proceedings, in which he avers that he did not receive a copy of G.H.'s weekly schedule at Options until five days before the hearing.  *See* Pl.'s Opp'n & Reply 6; Ostrem Statement, ECF No. 16-1.  (FPCS incorrectly construes Ms. Joaquin's briefing as a request to strike the schedule from the record.  *See* Def.'s Reply 5.)  Ms. Joaquin cites no legal authority for such an exception to the exhaustion requirement.  *Cf. Douglass v. District of Columbia*, 605 F. Supp. 2d 156, 165 (D.D.C. 2009) ("[A]bsent a showing that exhaustion would be futile or inadequate, a party must pursue all administrative avenues of redress under the [IDEA] before seeking judicial review under the Act." (quoting *Cox v. Jenkins*, 878 F.2d 414, 419 (D.C. Cir. 1989))).  To the extent that Ms. Joaquin contends that FPCS's late disclosure of the schedule prevented her from including this argument in her prehearing submissions, the Court concludes that nothing prevented her from making the argument orally at the hearing.

weekly schedule at Options, Ms. Joaquin first explains that time allocated to English, Math,

Science, and History—which she describes as "unambiguous academic class time"—amounted

to only 11 hours.  *See* AR 618; Mem. Supp. Pl.'s Mot. Summ. J. 8.  She then contends that

accounting for certain other periods in G.H.'s schedule (assumed *arguendo* to constitute

specialized education)—physical education, "Read Aloud," and computer-based instruction—

would bring total weekly specialized instruction to only about 18.1 hours.  *See* Mem. Supp. Pl.'s

Mot. Summ. J. 8–9.  But Ms. Joaquin fails to explain her premise that specialized instruction is

necessarily limited to these types of "academic" instruction.  *See* 34 C.F.R. § 300.39 (defining

"special education" and "specially designed instruction").  Second, even if this premise were

correct, Ms. Joaquin has proffered no record evidence establishing the non-academic nature of

the activities that she has excluded from her definition of specialized education.  For instance,

she asserts that "it cannot be seriously contended" that the sessions called "Fun Friday" and

"Real Talk" qualify as specialized instruction as opposed to behavioral support services (*i.e.*,

counseling), but she points to no record evidence in support.  *See* Pl.'s Opp'n & Reply 4.[8]  These

bare assertions cannot serve to meet Ms. Joaquin's burden.  *Reid*, 401 F.3d at 521.

---

[8] Ms. Joaquin asserts that at summary judgment, a moving party can carry her burden by
"'showing'—that is, pointing out to the district court—that there is an absence of evidence to
support the nonmoving party's case."  Mem. Supp. Pl.'s Mot. Summ. J. 7 (quoting *Celotex Corp.
v. Catrett*, 477 U.S. 317, 325 (1986)).  This proposition is correct where the nonmoving party
would bear the burden of proof at trial on the disputed issue.  *See Celotex*, 477 U.S. at 324.  But
here, Ms. Joaquin seeks judgment as the plaintiff who bears the burden of proof on the issue of
whether G.H. was denied a free appropriate public education.  Accordingly, she must support her
arguments with record evidence.  *See id.* at 331 (Brennan, J., dissenting on other grounds) ("If
the moving party will bear the burden of persuasion at trial, that party must support its motion
with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it
to a directed verdict if not controverted at trial.").  More fundamentally, Ms. Joaquin's reliance
on *Celotex* misunderstands the unique nature of the summary judgment inquiry in this case.
*Celotex* explained how courts determine whether there is a genuine dispute of material fact
warranting trial.  *See id.* at 322–24.  But in IDEA cases that follow an administrative proceeding,
the question at summary judgment is whether the hearing officer's conclusions (and her

Because Ms. Joaquin failed to exhaust her argument that G.H. received only 18.1 hours of specialized instruction per week and because, in the alternative, she has not demonstrated how the preponderance of the evidence supports her argument, the Court denies Ms. Joaquin's motion for summary judgment as to this issue and grants FPCS's cross-motion for summary judgment.

2.   Transition Services

Next, Ms. Joaquin argues that FPCS failed to provide G.H. with any transition services, in violation of the IEP's undisputed requirements of 45 minutes per day of college and career preparatory services and 16 hours per year of career-related field trips.  *See* Mem. Supp. Pl.'s Mot. Summ. J. 9; IEP, AR 446.

At the outset, the Court concludes that there is no genuine dispute of fact as to the lack of transition services afforded to G.H. at Options.  *See* Tr. 128–29 (G.H.'s testimony that he received no transition services).  First, FPCS has conceded the issue by failing to address it in its opposition, which argues only that G.H. suffered no harm.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a [nonmovant] files an opposition to a dispositive motion and addresses only certain arguments raised by the [movant], a court may treat those arguments that the [nonmovant] failed to address as conceded.").[9] Although FPCS asserts the existence of a factual dispute in its response to Ms. Joaquin's

---

resolution of the parties' factual disputes) are supported by the preponderance of the evidence. *See Heather S.*, 125 F.3d at 1052.

[9] In reply, FPCS asserts that it "does not concede that it did not provide transition services," without citing any relevant record evidence.  Def.'s Reply 5.  In a section of its briefing not pertaining specifically to transition services, FPCS cites the testimony of the Options clinical supervisor and special education coordinator that G.H. received "all" of the services mandated by his IEP.  *See* Def.'s Reply 4 (citing Tr. 511–12).  But in light of other record evidence (G.H.'s testimony and his weekly schedule apparently showing an absence of transition services), FPCS has failed to carry its burden of explaining why the hearing officer's finding of a "total failure to provide transition services" was incorrect.  HOD, AR 740; *see also Reid*, 401 F.3d at 521.

statement of facts, *see* Def.'s Resp. to Pl.'s Statement of Facts ¶ 6, ECF No. 14-1, FPCS only

cites G.H.'s truancy, *see id.*, and does not explain why the hearing officer's finding of a "total

failure to provide transition services" was incorrect, HOD, AR 740; *see also Reid*, 401 F.3d at

521.[10]

The parties' dispute, then, is of a legal as opposed to factual nature: The parties disagree

as to whether the absence of transition services amounted to a violation of the IDEA.  *See Bobby*

*R.*, 200 F.3d at 345 (noting that although there was no dispute of fact over the school district's

failures to provide certain services, the parties disagreed as to "the legal conclusions to be drawn

from those failures").  On this issue, the hearing officer's legal analysis was flawed in two

respects.  First, there is no basis for the hearing officer's conclusion that FPCS's failure to

provide transition services was a mere "procedural violation" of the IDEA.  HOD, AR 740–41;

*cf. Lesesne*, 447 F.3d at 834 (considering violation of "IDEA's procedural deadlines" for

evaluating the student).  Additionally, the hearing officer applied the incorrect legal standard,

requiring "evidence of harm" resulting from the deprivation of transition services.  HOD, AR

741; *see also Wilson*, 770 F. Supp. 2d at 275 (holding that a failure-to-implement plaintiff need

not prove that the student suffered "demonstrable educational harm" (citation and emphasis

omitted)).[11]  But here, the Court's focus is "not simply on whether the hearing officer erred, but

---

[10] G.H.'s truancy is potentially relevant to the question whether G.H. would have
benefitted from transition services had they been offered at Options—but this question is wholly
irrelevant to the instant inquiry, as the Court explains below.

[11]  The hearing officer's two legal errors are interrelated; the case law governing
*procedural* IDEA violations does suggest that a showing of "harm" is required.  "Harm," in the
context of procedural violations, is defined in terms of injury to the student's substantive rights
or educational opportunity.  *See Boose*, 786 F.3d at 1056; *Lesesne*, 447 F.3d at 834.  By contrast,
here, no procedural violation is at issue; the parties do not dispute that G.H. suffered injury to his
*substantive* rights on account of FPCS's failure to offer transition services.  The only question,
then, is whether this substantive injury is sufficiently "material."  *See Wilson*, 770 F. Supp. 2d at
274; *Catalan*, 478 F. Supp. 2d at 75.  (To maintain consistency with the failure-to-implement

rather, more broadly, [on] whether the child . . . is receiving the free appropriate public education mandated in the IDEA," as determined by the preponderance of the evidence. *Wilson*, 770 F. Supp. 2d at 275 (quoting *S.S. ex rel. Shank v. Howard Road Acad.*, 585 F. Supp. 2d 56, 66 (D.D.C. 2008)).

Having reviewed the record, the Court concludes that Ms. Joaquin has established by the preponderance of the evidence that FPCS's failure to provide G.H. with any transition services constituted a "material" deviation from G.H.'s IEP. *See Wilson*, 770 F. Supp. 2d at 274; *Catalan*, 478 F. Supp. 2d at 75. The "proportion of services mandated to those actually provided" was zero: As explained above, there is no dispute that FPCS provided none of the required transition services. *Turner*, 952 F. Supp. 2d at 40; *see also Wilson*, 770 F. Supp. 2d at 276 ("Because [the defendant] almost entirely failed to provide a service that [the student's] IEP team determined was necessary for his educational development, it denied him the education that the law requires."); *Savoy*, 844 F. Supp. 2d at 34 (requiring more than a "minimal difference in hours" between required and provided services). Additionally, the record clearly bears out the "goal and import (as articulated in the IEP) of the specific service that was withheld." *Turner*, 952 F. Supp. 2d at 40 (citing *Wilson*, 770 F. Supp. 2d at 275). Transition services were the primary means by which FPCS implemented G.H.'s "Post-Secondary Transition Plan," which aimed to help G.H. realize his short-term goals of determining admissions requirements for two-year colleges or trade schools and his long-term goals of attending such a college or school for

---

jurisprudence, the Court would read the procedural violation case law, too, to require a *material* injury to substantive rights or opportunities.) The Court also notes that the hearing officer determination contains a correct statement of the legal standard for failure-to-implement claims, though that standard was not applied. *See* HOD, AR 740–41 (citing *Catalan*'s requirement of "substantial or significant" or "material" IEP deviations). In short, the hearing officer seems to have conflated the procedural violation and failure-to-implement lines of authority and, in so doing, misapplied the test for "harm."

the purpose of becoming a mechanic.  IEP, AR 443–44.[12]  The record amply shows that

transition services were "feasible and in the best interest of" G.H.  *Catalan*, 478 F. Supp. 2d at

76; *see also* Tr. 440–45 (testimony that Options classrooms were staffed with a special education

teacher, a clinician, and a behavior support technician); *id.* at 144–45 (G.H.'s testimony that

although he "didn't even know" what a vocation program was while at Options, he appreciated

the New Beginnings program because he had "a vocational option").

The Court is not unsympathetic to FPCS's observation that G.H.'s sporadic attendance

was a major obstacle preventing him from enjoying the benefits of his specialized education.

The record shows that FPCS's multiple communications with Ms. Joaquin did little to improve

the situation and that FPCS ultimately referred G.H. to the Superior Court for truancy.  *See* AR

604–17.  Indeed, it is entirely possible that even if FPCS had fully implemented G.H.'s IEP, he

would not have been present to receive any transition services.[13]  But such a counterfactual has

no place in the instant inquiry: The Court is concerned only with whether material services

mandated by G.H.'s IEP were "provided."  *Turner*, 952 F. Supp. 2d at 40.  To hold otherwise

would be to transform the IDEA into a protector of outcomes rather than opportunities; just as a

plaintiff cannot prevail on a claim that a duly formulated and implemented IEP brought about no

actual educational progress, the IDEA does not recognize a defense that the proper

implementation of an IEP provision would have yielded no incremental benefit.  *Cf. Leggett*, 793

F.3d at 70 ("[A]n IEP is generally 'proper under the Act' if 'reasonably calculated to enable the

---

[12] Although G.H.'s IEP suggests that his extracurricular activities, community participation, and academic course of study were relevant, in a holistic sense, to his post-secondary transition, *see* IEP, AR 445–46, it appears that transition services were the only means by which FPCS staff could work with G.H. directly and expressly on his transition-related goals.

[13] Somewhat unsurprisingly, however, the record is silent as to whether G.H.'s absences coincided with days on which FPCS would have offered transition services, if any such days even existed.

child to receive educational benefits.'" (citation omitted)); *Shank*, 585 F. Supp. 2d at 71

(explaining that in considering challenge to adequacy of IEP, the test is "not whether, *ex post*,

[the student] can be deemed to have actually derived educational benefits").

Because the preponderance of the evidence supports the conclusion that FPCS's failure to

provide transition services was a material departure from G.H.'s IEP amounting to the denial of a

free appropriate public education, as to this issue, the Court grants Ms. Joaquin's motion for

summary judgment and denies FPCS's cross-motion for summary judgment.

### 3.  Behavior Intervention Plan

Ms. Joaquin further argues that FPCS departed from many "specific requirements" of

G.H.'s BIP.  In particular, Ms. Joaquin identifies six BIP requirements that FPCS failed to

satisfy: The teachers and staff at Options allegedly did not (1) "check in with [him] frequently,"

(2) provide "constant, positive reinforcement for appropriate behavior," (3) "provide immediate

verbal praise and/or public recognition for appropriate behavior and task completion," (4) offer

"verbal praise . . . for any achievements," (5) assign him certain classroom "responsibilities [that]

he prefers (i.e. handing out papers or being the group leader)," or (6) give him a "daily tracker"

for use in monitoring his own performance and behavior.  BIP, AR 217–18; *see also* Mem. Supp.

Pl.'s Mot. Summ. J. 9–10, 12 n.7.

With respect to the first four requirements that teachers and staff check in frequently and

provide positive reinforcement or verbal praise, the Court concludes that Ms. Joaquin has failed

to carry her burden in challenging the hearing officer's conclusions.  *See Reid*, 401 F.3d at 521

(explaining that party challenging HOD "take[s] on the burden of persuading the court that the

hearing officer was wrong").  Ms. Joaquin relies solely on G.H.'s testimony.  *See* Mem. Supp.

Pl.'s Mot. Summ. J. 10 (citing Tr. 113–14, 132–34).  To be sure, G.H. testified that he spent most

of his time at Options working on a computer-based learning program rather than receiving any

direct instruction from a teacher in the "traditional" manner.  *See* Tr. 112–14.  But even crediting

G.H.'s testimony fully, he said nothing about whether any teachers failed to check in or to

provide positive reinforcement or praise.[14]  Even if his testimony might be read to support such

an inference, Ms. Joaquin has not explained why the hearing officer erred by not drawing such

an inference.  *See Reid*, 401 F.3d at 521.[15]

As for the latter two BIP mandates to give G.H. certain classroom responsibilities and to

allow him to participate in tracking his own performance and behavior, the Court concludes that

even if Ms. Joaquin has established by the preponderance of the evidence that FPCS deviated

from the BIP in these two respects, *see* Tr. 132–34, she has not established that these deviations

were sufficiently "material," either standing alone or taken together.  *See Catalan*, 478 F. Supp.

2d at 75.  The BIP provisions at issue are just two of nearly two dozen "Context and Intervention

Strategies."  BIP, AR 217; *see also Turner*, 952 F. Supp. 2d at 40 (explaining that materiality

determination rests in part on the "proportion of services mandated to those actually provided").

Moreover, there is no evidence that the "goal and import . . . of the specific service that was

withheld" were undermined in any way: Based on the preponderance of the evidence in this

record, the hearing officer could have reasonably concluded that all of the BIP strategies

collectively promoted positive behavior and that the unimplemented strategies had no special

importance in furthering that overarching objective.  *Turner*, 952 F. Supp. 2d at 40; BIP, AR

217; HOD, AR 741 ("Handing out papers was just . . . one of many, many behavioral strategies

---

[14] Additionally, the BIP calls for positive reinforcement only upon "appropriate behavior"
or "achievements," and the record is silent as to whether G.H. fulfilled these prerequisites.  BIP,
AR 217–18.

[15] Because this Court's review is not de novo, it need not decide whether it would have
drawn such an inference if presented with the issue in the first instance.  *See Roark*, 460 F. Supp.
2d at 38.

to be employed."); *cf. supra* Part IV.A.2 (finding that FPCS's failure to provide G.H. with *any* transition services constituted a material deviation from his IEP because those services were the "primary means" by which FPCS was to help G.H. achieve specific career-related goals).  At bottom, Ms. Joaquin has failed to "persuad[e] the court that the hearing officer was wrong" in concluding that the alleged deviations from G.H.'s BIP were immaterial.  *Reid*, 401 F.3d at 521.[16]

Because the preponderance of the evidence supports the hearing officer's determination that any deviations from G.H.'s BIP were not material, as to this issue, the Court denies Ms. Joaquin's motion for summary judgment and grants FPCS's cross-motion for summary judgment.

### 4.  Appropriateness of Placement

Lastly, Ms. Joaquin asserts that FPCS's decision to place G.H. in the co-located classroom at Options was a material departure from his IEP and denied him a free appropriate public education.  *See* Mem. Supp. Pl.'s Mot. Summ. J. 12–13.  In support, Ms. Joaquin proffers the three arguments discussed above concerning insufficient specialized instruction, lack of transition services, and deviation from the BIP, along with the additional contention that "[a]ll" of G.H.'s instruction in the co-located classroom consisted of "self-directed, unassisted work on a computer," which caused G.H. to lose interest and roam the school.  *Id.* at 13 (citing Tr. 114, 120–21, 141–43).

---

[16] In analyzing Ms. Joaquin's claim as to G.H.'s BIP, the hearing officer again suggests that a plaintiff must demonstrate actual "harm" to the student by echoing her analysis of the transition services issue: "[T]he evidence in the record was very strong and clear that Student, by his own admission, was not going to cooperate or participate in any activities offered by School B."  HOD, AR 741.  As explained above, a showing of actual harm is not required to establish the denial of a free appropriate public education in violation of the IDEA.  *See supra* Part IV.A.2.

Although FPCS's cross-motion entirely fails to respond to Ms. Joaquin's challenge to G.H.'s placement,[17] the Court nonetheless concludes that Ms. Joaquin has not carried her "burden of persuading the court that the hearing officer was wrong" in concluding that G.H.'s placement was not inappropriate. *Reid*, 401 F.3d at 521.[18]  There is no record evidence that Options was not "capable of fulfilling" the requirements of G.H.'s IEP. *Lofton*, 7 F. Supp. 3d at 123.  To be sure, as explained above, the preponderance of the evidence shows that G.H. was deprived of transition services while he was at Options, but this evidence does not support the distinct conclusion that Options lacked the *ability or resources* for providing such services. *See S.S. by & through Street v. District of Columbia*, 68 F. Supp. 3d 1, 18, n.7 (D.D.C. 2014) (distinguishing between failure to provide services and capability and resources to provide services); *Lofton*, 7 F. Supp. 3d at 123.  Regarding Ms. Joaquin's contention that computer-based learning was inherently inappropriate, the preponderance of the evidence supports the hearing officer's finding that G.H. performed relatively well using the same computer program during the summer of 2013, albeit with the benefit of one-on-one assistance. *See* HOD, AR 740; Tr. 136–37; AR 655.[19]

---

[17] When finally responding in reply to Ms. Joaquin's challenge to G.H.'s placement, FPCS merely recites facts from the record without any discussion of applicable legal standards. *See* Def.'s Reply 1–4.

[18] Before the hearing officer, Ms. Joaquin based her challenge to G.H.'s placement on FPCS's failure to provide a full-time vocational program and the elimination of funding at Options, rather than the four reasons (now asserted) of insufficient specialized instruction, lack of transition services, deviation from the BIP, and inappropriate computer-based instruction. *See* Due Process Compl. Notice ¶¶ 97–108 (alleging generally that placement was not "appropriate"); HOD, AR 739, 742 (re-stating "first issue" and "second issue" in Ms. Joaquin's due process claim).  FPCS does not raise an exhaustion defense (or any defense).  In any event, because the hearing officer fully rejected Ms. Joaquin's challenges to G.H.'s placement (albeit on arguably different grounds), Ms. Joaquin still bears the "burden of persuading the court that the hearing officer was wrong" in reaching this conclusion. *Reid*, 401 F.3d at 521.

[19] To the extent that Ms. Joaquin contends that Options was an inappropriate placement because it failed to provide one-on-one instruction during the spring and fall semesters, her claim

Because the preponderance of the evidence supports the hearing officer's determination that G.H.'s placement at Options was not inappropriate, as to this issue, the Court denies Ms. Joaquin's motion for summary judgment and grants FPCS's cross-motion for summary judgment.

*     *     *

Accordingly, the Court concludes that Ms. Joaquin is entitled to judgment that FPCS denied G.H. a free appropriate public education and violated the IDEA by failing to provide G.H. with any IEP-mandated transition services.  As to all of her other claims, the Court denies her motion for summary judgment and grants FPCS's cross-motion for summary judgment.

## B.  Remedy

Having concluded above that the preponderance of the evidence shows that FPCS violated the IDEA by failing to provide G.H. with transition services, the Court leaves the task of crafting the appropriate remedy to the hearing officer, who is better situated to make factual findings and distill G.H.'s current educational needs in the first instance.

The Court's decision to remand is informed by two considerations.  First, the record contains insufficient evidence pertaining to compensatory education as it relates to G.H.'s transition services.  Ms. Joaquin's expert who testified on compensatory education addressed only academic instruction, not G.H.'s transition services.  *See* Tr. 284–92.  Accordingly, the Court has no factual record upon which it can devise an appropriate remedy.  *See Wilson*, 770 F. Supp. 2d at 277 (remanding to hearing officer to consider compensatory education where "the record lack[ed] sufficient information").

---

would fail.  Ms. Joaquin has not identified any requirement in the IEP that G.H. must receive one-on-one instruction.  Even if there were such a requirement, G.H.'s testimony does not establish that Options was not "capable" of providing one-on-one instruction during the spring and fall.  *Lofton*, 7 F. Supp. 3d at 123.

Second, the relief that Ms. Joaquin now requests is itself uncertain.  In her complaint, Ms. Joaquin asks the Court to order FPCS to fund certain psychological, functional behavioral, and vocational assessments; to convene an IEP team meeting; and to provide compensatory education.  *See* Compl. 3.  But in her motion for summary judgment, Ms. Joaquin seeks only an order directing FPCS to "fund G.H.'s participation in three classes . . . at New Beginnings Vocational School"—Geometry, Biology, and English III—and to provide "20 hours of individual tutoring for each of the three classes."  Pl.'s Mot. Summ. J. 1.  (In a footnote, Ms. Joaquin explains that she has "declined to pursue other claims in her Complaint."  *Id.* at 1 n.1.)  Yet in her supporting memorandum and in her opposition and reply, Ms. Joaquin requests in the alternative that the Court "order funding for a compensatory education evaluation."  Pl.'s Opp'n & Reply 7 n.3; *see also* Mem. Supp. Pl.'s Mot. Summ. J. 14.  To the extent that Ms. Joaquin now requests only academic instruction and tutoring, this remedy seems to correspond only to her claim that FPCS failed to offer G.H. sufficient specialized instruction—a claim on which she did *not* prevail in this Court, as explained above.  *See supra* Part IV.A.1.  But to the extent that she requests compensatory education more broadly or a compensatory education evaluation, certain elements of that remedy could encompass transition services.

Accordingly, on remand, the hearing officer shall consider whether any relief requested by Ms. Joaquin is pertinent to G.H.'s wrongfully denied transition services and, if so, develop an award of compensatory education "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place."  *Reid*, 401 F.3d at 524.[20]

---

[20] This Court, to be sure, has discretion to take additional evidence and hold a hearing to determine the proper relief.  *See Branham v. Gov't of D.C.*, 427 F.3d 7, 13 (D.C. Cir. 2005) ("[I]n light of the educational harms [the student] has already suffered, we encourage the district

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 10) is

**GRANTED IN PART AND DENIED IN PART**, and Defendant's cross-motion for summary

judgment (ECF Nos. 13, 14) is **GRANTED IN PART AND DENIED IN PART**.  An Order

consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 3, 2015                                       RUDOLPH CONTRERAS
                                                               United States District Judge

---

court to undertake the evidentiary hearing itself in order to minimize the potential for further delay.").  But here, where "both parties . . . filed cross-motions for summary judgment rather than exercising their right to 'request' consideration of additional evidence," the Court concludes that remand is the more "'appropriate' relief." *Reid*, 401 F.3d at 526 (citations omitted).